Jasen, J. (dissenting).
Where there has been no previous adjudication of incompetency, the burden of proving mental incompetence is upon the party alleging it. I agree with the majority at the Appellate Division that the plaintiff, the husband of the decedent, failed to sustain the burden incumbent upon him of proving deceased’s incompetence.
The evidence conclusively establishes that the decedent, at the time she made her application to retire, understood not only that she was retiring, but also that she had selected the maximum payment during her lifetime.
Indeed, the letter written by the deceased to the Teachers’ Retirement System prior to her retirement demonstrates her *207 full mental capacity to understand and to decide whether to take an option or the maximum allowance. The full text of the letter reads as follows:
February 8, 1965
*
Gentlemen:
I would like to retire on Feb. 12 or Feb. 15. In other words, just as soon as possible after I receive the information I need in order to decide whether to take an option or maximum allowance. Following are the questions I would like to have answered:
1. What is my ‘ average ’ five-year salary?
2. What is my maximum allowance ?
3. I am 60 years old. If I select option four-a with a beneficiary (female) 27 years younger, what is my allowance?
4. If I select four-a on the pension part only, and take the maximum annuity, what is my allowance?
5. If I take a loan of 89% of my year’s salary before retirement, what would my maixmum allowance be?
6. If I take a loan of $5,000 before retiring, and select option four-a on both the pension and annuity, what would my allowance be?
7. What is my total service credit? I have been on a leave without pay since Oct. 26,19,64.
8. What is the ‘ factor ’ used for calculating option four-a with the above beneficiary®
Thank you for your promptness in making the necessary calculations. I will come to your office on Thursday afternoon of this week.
It seems clear that this detailed, explicit and extremely pertinent list of queries reveals a mind fully in command of the salient features o.f the Teachers’ Retirement System. Certainly, it cannot be said that the decedent could possess sufficient capacity to compose a letter indicating such a comprehensive understanding qf the retirement system, and yet' lack the capacity to understand the answers.
As I read the record, the evidence establishes that the depedent’s election to receive maximum payments was predicated on the need for a higher income to support two retired persons — her husband and herself. Since the only source of income available to decedent and her husband was decedent’s retirement pay, the additional payment of $75 per month which she would receive by electing the maximal payment was a necessity. Indeed, the additional payments represented an increase of 20% over the benefits payable under option 1. Under these *208 circumstances, an election of maximal income during decedent’s lifetime was not only a rational, but a necessary decision.
Further indication of decedent’s knowledge of the financial needs of her family is evidenced by the fact that she took a loan for the maximum amount ($8,760) permitted by the retirement system, at the time she made application for retirement.
Moreover, there is nothing in the record to indicate that the decedent had any warning, premonition, knowledge or indication at the time of retirement that her life expectancy was, in any way, reduced by her condition.
Decedent’s election of the maximum retirement benefits, therefore, was not so contrary to her best interests so as to create an inference of her mental incompetence.
Indeed, concerning election of options under a retirement system, it has been held: “Even where no previous election has been made, the court must make the election for an incompetent which would be in accordance with what would have been his manifest and reasonable choice if he were sane, and, in the absence of convincing evidence that the incompetent would have made a different selection, it is presumed that he would have chosen the option yielding the largest returns in his lifetime.” (Schwartzberg v. Teachers’ Retirement Bd., 273 App. Div. 240, 242-243, affd. 298 N. Y. 741; emphasis supplied.)
Nor can I agree with the majority’s view that the traditional rules governing competency to contract ‘ ‘ are, for the most part, too restrictive and rest on a false factual basis ”.
The issue confronting the courts concerning mental capacity to contract is under what circumstances and conditions should a party be relieved of contractual obligations freely entered. This is peculiarly a legal decision, although, of course, available medical knowledge forms a datum which influences the legal choice. It is common knowledge that the present state of psychiatric knowledge is inadequate to provide a fixed rule for each and every type of mental disorder. Thus, the generally accepted rules which have evolved to determine mental responsibility are general enough in application to encompass all types of mental disorders, and phrased in a manner which can be understood and practically applied by juries composed of laymen.
*209 The generally accepted test of mental competency to contract which has thus evolved is whether the party attempting to avoid the contract was capable of understanding and appreciating the nature and consequences of the particular act or transaction which he challenges. (Schwartzberg v. Teachers’ Retirement Bd., supra; Paine v. Aldrich, 133 N. Y. 544; Beisman v. New York City Employees’ Retirement System, 275 App. Div. 836, affd. 300 N. Y. 580.) This rule represents a balance struck between policies to protect the security of transactions between individuals and freedom of contract on the one hand, and protection of those mentally handicapped on the other hand. In my opinion, this rule has proven workable in practice and fair in result. A broad range of evidence including psychiatric testimony is admissible under the existing rules to establish a party’s mental condition. (See 2 Wigmore, Evidence [3d ed.], §§ 227-233.) In the final analysis, the lay jury will infer the state of the party’s mind from his observed behavior as indicated by the evidence presented at trial. Each juror instinctively judges what is normal and what is abnormal conduct from his own experience, and the generally accepted test harmonizes the competing policy considerations with human experience to achieve the fairest result in the greatest number of cases.
As in every situation where the law must draw a line between liability and nonliability, between responsibility and non-responsibility, there will be borderline cases, and injustices may occur by deciding erroneously that an individual belongs on one side of the line or the other. To minimize the chances of such injustices occurring, the line should be drawn as clearly as possible.
The Appellate Division correctly found that the deceased was capable of understanding the nature and effect of her retirement benefits, and exercised rational judgment in electing to receive the maximum allowance during her lifetime. I fear that the majority’s .refinement of the generally accepted rules will prove unworkable in practice, and make many contracts vulnerable to psychological attack. Any benefit to those who understand what they are doing, but are unable to exercise self-discipline, will be outweighed by frivolous claims which will burden our courts and undermine the security of contracts. The reasonable expectations of those who innocently deal with persons who *210 appear rational and who understand what they are doing should he protected.
Accordingly, I would affirm the order appealed from.
Chief Judge Fuld and Judges Burke and Bergaet concur with Judge Breitel; Judge Jaseet dissents and votes to affirm in separate opinion in which Judge Scileppi concurs.
Order reversed, without costs, and a new trial granted.